**13**
**LAW OFFICES OF GABRIEL LIBERMAN, APC**
Gabriel E. Liberman (SBN 303010)
Gabe@4851111.com
2033 Howe Avenue, Suite 140
Sacramento, California 95825
Telephone:     (916) 485-1111
Facsimile:      (916) 485-1111

Proposed Attorney for Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No. 2019-27396-B-11 |
| | DCNS:  GEL-1, GEL-2, GEL-3 |
| **HENDRICKSON TRUCK LINES, INC.** | |
| | Date:         December 3, 2019 |
| FEIN: 47-1616076 | Time:         9:30 a.m. |
| | Location:   501 I Street, 6th floor, |
| | Courtroom ; |
| | Sacramento, CA |
| Debtor. | |
| | Judge:       Honorable Christopher D. Jaime |

**DECLARATION OF ALBAN LANG IN SUPPORT OF DEBTOR'S CHAPTER 11
PETITION, FIRST DAY MOTIONS:  (1) DEBTOR-IN-POSSESSION FINANCING
MOTION; (2)  PRE-PETITION WAGE MOTION; AND CASH COLLATERAL MOTION**

I, Alban Lang, hereby declare as follows:

1.  I am over the age of 18 and am mentally competent and I make this declaration in support of

1.  *Debtor's Emergency Motion For Order Authorizing Debtor To Obtain Debtor-In-Possession Financing* (the "DIP Financing Motion"); *Emergency Motion For Order To (i) Pay Prepetition Wages, Salaries, Withholding Obligations, And Other Compensation And Benefits; ii) Maintain Employee Benefits Programs; And iii) Authorizing And Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations* (the "Wage Motion");

1    and Emergency Motion For Entry Of Interim And Final Order (i) Authorizing The Debtor's Use

2    Of Cash Collateral, (ii) Approving Adequate Protection To Prepetition Lender  And (iii)

3    Scheduling A Final Hearing (the "<u>Cash Collateral Motion</u>") (collectively, the "<u>First Day</u>

4    <u>Motions</u>").[1]

5     2.   I am the vice president, chief financial officer and secretary of HENDRICKSON TRUCK

6    LINES, INC., the debtor and debtor-in-possession ("<u>Debtor</u>")

7     3.   In my capacity as Debtor's vice president, chief financial officer and secretary, I am familiar

8    with Debtor's daily business, operations, and financial affairs. Except as otherwise indicated, all

9    of the facts set forth in this Declaration are based upon my personal knowledge of Debtor's

10    operations and finances, information learned from my review of relevant documents, and

11    information supplied to me by other members of Debtor's management and Debtor's business and

12    legal advisors. If called upon to testify as to the content of this Declaration, I could and would do

13    so.

14     4.   On November 27, 2019, the Debtor filed its voluntary petition for relief under Chapter 11 of

15    the Bankruptcy Code, thereby commencing the above-captioned case.

16     5.   The Debtor is operating its business and managing its properties as debtor in possession

17     pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18     6.   No request has been made for the appointment of a trustee or examiner, and no official

19     committees have been appointed in this case.

20    **Debtor's History**

21     7.   Debtor is a California corporation and a small, family-owned over-the-road

22    interstate trucking company which serves ten (10) Western states (AZ, CA, CO, ID, NM, NV,

23    OR, UT, WA, & WY) with principal place of business at 7080 Florin Perkins Road, Sacramento,

24    California 95829.

25     8.   Debtor has been operating since 1976 and was formerly doing business as Hendrickson

26

27    _____

28    [1] All capitalized, undefined terms shall have the meanings ascribed to them in the First Day Motions.

1  Trucking Inc. On June 19, 2015, Hendrickson Trucking, Inc., FEIN: 68-0318984, filed for

2  chapter 11 bankruptcy protection in the Eastern District of California, Sacramento Division, case

3  no. 2015-24947-B-11 (the "Prior Case"). On February 20, 2017, the Court entered its order [ECF

4  No. 477] confirming Hendrickson Trucking, Inc.'s chapter 11 plan of reorganization (the "Plan").

5  Pursuant to the terms of the Plan, Hendrickson Trucking Inc. thereafter transferred its assets and

6  liabilities, including the Plan's obligations to the Debtor.

7   9.   Following the closing of the Prior Case, Debtor was able to perform its contractual

8  obligations under the Plan and paid roughly 64% of the Plan's liabilities as follows:

| Creditor | Plan Obligations | Amount Paid YTD | Current Balance |
|---|---|---|---|
| Administrative claims | $169,611.93 | $169,611.93 | $0.00 |
| General Unsecured creditor claims | $766,541.03 | $766,541.03 | $0.00 |
| Sacramento County Tax Collector | $965,764.78 | $95,764.78 | $0.00 |
| Daimler Chrysler – Deficiency claim | $400,000.00 | $199,466.62 | $200,533.38 |
| Internal Revenue Service | $555,637.55 | $315,417.89 | $240,219.66 |
| Employment Development Dept. | $805,559.21 | $344,189.05 | $461,370.16 |
| CA State Board of Equalization | $127,562.84 | $45,346.58 | $82,216.26 |
| Oregon Dept. of Transportation | $672,548.97 | $234,381.10 | $438,167.87 |
| **Totals:** | **$3,593,226.31** | **$2,170,718.98 (64%)** | **$1,422,507.33 (36%)** |

22     **The Events Necessitating the Bankruptcy Filing.**

23   10. Since confirming the Plan in the Prior Case, Debtor was able to sustain its normal on-going

24  expenses and the on-going Plan obligations, all awhile sustaining a healthy profit margin. This all

25  changed in or around January 2019, where the trucking freight market started to soften which led

26  Debtor's customer taking bids from competitors at lower freight rates. With the decline in the

27  overall freight tonnage and excessive truck capacity in the market, rates took a shark decline,

28

3

1  from .57 per mile or 21% lower than 2018 rates. Debtor estimates the reduction of the rate

2  reduced its monthly gross revenue around $400,000 less each month while it was still obligated to

3  drive the same mileage.

4   11. In addition to the rate decline, Debtor's top two customers elected to shift approximately

5  50% of Debtor's business to lower cost providers. These reduction in rates were industry wide

6  and prevented Debtor from being able to replace its lost business revenue with similar revenue.

7  To compound these issues, Debtor was in need of replacing its older trucks with lower mileage

8  trucks and entered into a lease agreement in early 2019 with 19th Capital Group, LLC for 89

9  trucks with a monthly lease payment of $132,950.00. Thereafter, Debtor experienced

10  unanticipated maintenance issues with 25 of the new leased trucks, with issues beyond normal

11  maintenance and service of trucks at their current age and mileage. Many of the trucks were not

12  road worthy and broke down right after they were put in service and the combination of repairs to

13  make them operable along with the downtime, immediately affected Debtor's cash flow. Debtor

14  estimates the defective trucks costs the Debtor roughly $863,963, broken down as follows: (1)

15  Cost to repair trucks: $181,963; (2) Towing fees: $12,000; and (3) Lost revenue and downtime:

16  $606,250.00.

17   12. As a result of the issues addressed above, Debtor's cash flow reduced dramatically which

18  caused Debtor to fall behind on the remaining Plan obligations, currently one-month delinquent,

19  and the 19th Capital Group, LLC lease payments, currently one month behind with December's

20  payment coming due shortly. Debtor reached out to 19th Capital Group, LLC to try and resolve

21  the various issues with the defective trucks but was advised that they would not work with the

22  Debtor until it came current, which it simply does not have the liquid capital to do, which will

23  lead to the repossession of the 89 trucks, resulting a complete shutdown of Debtor's business and

24  an inevitable liquidation.

25   13. Debtor now files the instant case to reorganize its debts including resolution of the 19th

26  Capital Group, LLC lease obligations and the Prior Case's Plan obligations.

27                              **FIRST DAY MOTIONS**

28    **A.  The DIP Financing Motion**

4

14. Debtor presently has a factoring arrangement with Transportation Alliance Bank Inc. ("TAB").

Specifically, Debtor sells substantially all of its accounts receivable to TAB; thereafter, account debtors make payments directly to TAB. As of the Petition Date, the total sum of such receivables sold to TAB was $2,901,979.00.

15. Debtor cannot operate without the income represented by such receivables. See the post-petition operating budget offered herewith as Exhibit "C" and incorporated herein by reference. The budget accurately reflects my estimates of ongoing and future income and expenses.

16. Failure to replace the income represented by the aforesaid receivables would deprive Debtor of at least one-month's projected income and render the budget unfeasible. If so, then Debtor would be forced to close its doors and liquidate.

17. TAB has offered to enter into an agreement to provide financing during the administration of this case (the "Agreement"), a true and correct copy of which is offered herewith as Exhibit "B" and is incorporated herein by reference. The terms of the proposed financing are similar to Debtor's existing agreement with TAB.

18. Of the maximum financing amount of $3 million, I anticipate that that Debtor will use approximately $1.6 million of the facility to fund operating expenses.

19. I estimate that the reserve account Debtor will be required to maintain under the Agreement will be approximately $200,000.

20. I estimate that the non-default fees and charges provided in the Agreement will be approximately $15,000 per month.

21. In addition to any reporting required by the Agreement, Debtor has resolved to file with the Court a report of accounts receivable sold to TAB with its monthly operating reports.

22. I have determined that TAB's offer is the best available. I have further determined that the proposed financing is in the best interests of the estate.

**B. The Wage Motion**

23. As of the Petition Date, the Debtor employs approximately 124 people (the "Employees"), of

1 which 98 are drivers who are paid by the mile driven, 26 are office employees who are paid

2 hourly, and three officers, including Debtor's proposed responsible individual, who are paid bi-

3 weekly on a salary basis.

4   24. The employees are paid bi-weekly, the as of the petition date, each employee is owed about

5 one weeks' worth of wages for the period of November 20, 2019, through the Petition Date

6 (November 27, 2019). In every case, the accrued but unpaid wages owed to each individual

7 employee is equal to or less than the amount entitled to priority under Bankruptcy Code section

8 507(a)(4) or less than $13,650.00. Because retention of employees is necessary to prevent

9 irreparable harm to the Estate.

10   25. In the ordinary course of business, the Debtor has incurred certain pre-petition employee

11 obligations that remain unpaid as of the Petition Date. Even though arising prior to the Petition

12 Date, these obligations (collectively, the "Employee Obligations") will become due and payable

13 in the ordinary course of the Debtor's business on and after the Petition Date. These obligations

14 can generally be categorized as follows: (a) wages, salaries, reimbursement, and other

15 compensation; (b) payroll taxes; (c) vacation and holiday programs; and (d) health and welfare

16 benefits provided to the Employees in the ordinary course of business.

17   26. These obligations are described as follows:

18

19     a.  *Wages, salaries, and other compensation.* Wages, salaries, and other compensation consist of pre-petition wages and salaries owed to the Debtor's Employees (the

20         "Payroll Obligations"). Employees are paid on a bi-weekly basis. The gross Payroll Obligation for the full pay period prior to the petition date, which was paid prior to

21         fling of the petition was $302,908, including the $17,614 per bi-weekly salary paid to Debtor's three officers. This gross amount includes certain deductions described

22         separately below, such as payroll taxes owed by the Employees. Nearly all of the Payroll Obligations are electronically deposited directly into the Employees' bank

23         accounts with the balance paid by check. As of the Petition Date, the Debtor estimates that it owes approximately $151,454 in Payroll Obligations. Attached as

24         **Exhibits "B" ,"C"** and "**D**" are the payroll reports of the pay period owed up to the

25         Petition Date, which was paid prior to filing of the petition.

26     b.  *Payroll taxes.* These obligations consist of federal, state, and local income tax withholdings, Social Security, and Medicare taxes (the "Payroll Taxes"). The Payroll

27         Taxes include the amounts owed by the Employees that the Debtor withholds from

28         the gross amount of the Employees' wages or salary as well as the amounts

separately owed by the Debtor. The Debtor's Payroll Taxes for the period prior to the petition date is estimated at $54,331. This includes approximately $38,693 for the employer obligation and approximately $15,638 for the employee component.

    c. *Vacation and sick programs.* These obligations consist of time off for vacation, illness and company holidays: o *Sick Leave.* In accordance with California law, all Employees may take up to three days of sick leave per year.

        o *Vacation.* All Employees receive two weeks of paid vacation per year after one year of service.

    The Debtor desires to continue to honor its obligations for sick days and vacation on a going-forward basis. The Debtor does not have a reliable estimate that the aggregate amount of accrued vacation time as of the Petition Date. Any amounts owing for accrued vacation time is not included in the total Payroll Obligations described above

    d. *Expense reimbursement and other benefits.* The Debtor reimburse eligible Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor. These reimbursement obligations include such things as travel expenses, meals and entertainment, scale fees, tolls, and office supply reimbursements.

    e. *Health and welfare benefits.* The Debtor provides health and welfare benefit plans for its Employees, including insurance plans relating to medical (health and prescription), dental, vision, and life insurance (collectively, the "<u>Employee Health Benefits</u>").

        o *Medical Plans.* The Debtor maintains a medical care plans for its Employees through Kaiser Permanente. The Debtor funds approximately one half of the plan's cost per Employee, with the Employees paying the other one half. Additionally, Employees may add family members to the plan, but they pay 100% of the additional premium.

        o *Dental; Vision; Basic Life and Accidental Death Dismemberment Insurance.* The Debtor also provides all Employees with dental plan, vision plan, and basic life and accidental death insurance (the "<u>Supplemental Health Plans</u>") administered by Kaiser Permanente. Under the Supplemental Health Plans, Debtor pays 100% to the costs of the Supplemental Health Plans.

    As of the Petition Date, the Debtor owe approximately $132,890 on account of the Employee Health Benefits.

  27. The Debtor seeks this Courts authority to pay the Employee Obligations that become due and owing during the Chapter 11 Case and to continue its practices, programs, and policies that were in effect as of the Petition Date. The Debtor request that all banks and other financial institutions be

1  authorized and directed, when requested by the Debtor and in the Debtor's sole discretion, to receive,

2  process, honor, and pay any and all checks drawn on the Debtor's accounts to pay the Employee

3  Obligations, provided that sufficient funds are available in the applicable accounts to make the

4  payments and transfers. The Debtor similarly request that they be authorized to pay any cost or

5  penalty incurred by its Employees in the event that a check issued by the Debtor for payment of the

6  Employee Obligations is inadvertently not honored because of the filing of the Debtor's bankruptcy

7  case.

8      **C.  The Cash Collateral Motion**

9      28. Debtor has a pre-petition factoring arrangement with TAB. Specifically Debtor performs

10  trucking services and generates an invoice owed by various large commercial clients.  Collecting

11  on the invoice takes work and time.  Debtor does not have a collection department or software and

12  so TAB is relied on to do all the collection work.  Debtor also cannot wait for the payment on the

13  invoice because expenses need to be paid immediately.  So, TAB acts as a collection company and

14  factoring financing.  Debtor assigns the invoice to TAB and TAB immediately disburses 90% of

15  the invoice amount to Debtor (then about 7% in about 45 days once invoices are collected while

16  TAB retains about 3% as its admin/collection/financing fee).  The sum of such receivables as of

17  the Petition Date was $2,901,979.00.

18      29. Debtor requests authority to use all cash and other amounts on deposit or maintained in any

19  account of the Debtor and all amounts generated by the collection of accounts receivable or other

20  disposition of assets which constitute prepetition collateral of the one secured creditor, TAB (the

21  "Cash Collateral"), as further embodied in the prepetition factoring agreements and the factoring

22  arrangement described herein. Under the prepetition factoring arrangement virtually all of Debtor's

23  accounts had been sold to TAB, and cash received is applied on a daily basis against outstanding

24  obligations under the prepetition agreement.

25      30. Debtor relies upon the factoring arrangements to operate its business, and said agreement in

26  turn rely upon the Debtor's Cash Collateral to function. Without Debtor's relationship with TAB it

27  would not have the ability to pay its obligations as they became due.

28      31. Prior to the Petition Date, TAB made certain loans to the Debtor more particularly described

1   as follows:

2           a.      An Accounts Receivable Financing and Security Agreement dated March

3   29, 2006 which was amended pursuant to that certain Amended and Restated Accounts

4   Receivable Financing and Security Agreement dated March 13, 2009 and amended pursuant

5   to that certain Amended and Restated Accounts Receivable Financing and Security

6   Agreement dated March 25, 2019 (the "A/R Loan"), a true and correct copy of which is

7   attached as **Exhibit "C"** hereto.  The balance owed by the Debtor on the A/R Loan was at

8   least $2,551,612.00 as of the Petition Date, exclusive of legal fees and costs.  The A/R loan

9   is secured by a senior, first-in-priority lien on all assets of the Debtor, as evidenced by that

10  certain UCC-1 financing statement recorded on December 24, 2014, as Instrument No.

11  46393790002 (a true and correct copy of which is attached as **Exhibit "D"** hereto), and

12  which was continued pursuant to that certain UCC-3 continuation statement recorded on

13  September 16, 2019, as Instrument No. 81827880002 (a true and correct copy of which is

14  attached as **Exhibit "E"** hereto).

15          b.      That certain Business Loan Agreement entered into between the Debtor and

16  TAB on or about July 30, 2008, in the principal amount of $1,005,000.00 and modified on

17  March 24, 2017 (the "Real Estate Loan").  The Real Estate Loan is evidenced by a Collateral

18  Note dated March 24, 2017 (the "Note"), a true and correct copy of which is attached as

19  **Exhibit "F"** hereto.  The Real Estate Loan is secured by a second-priority deed of trust in

20  favor of TAB and encumbering the Debtor's real estate located at 7080 Florin Perkins Road,

21  Sacramento, California (the "Florin Road Property").  That deed of trust (the "Deed of

22  Trust"), a true and correct copy of which is attached as **Exhibit "G"** hereto, was recorded

23  in the Official Records of Sacramento County on February 23, 2009, as Document No.

24  20090223.[2]   The balance owed by the Debtor on the Real Estate Loan was at least

25  $1,353,79600 as of the Petition Date, exclusive of legal fees and costs.

26  ---
    [2] Ward and William Hendrickson, principals of the Debtor, executed Commercial Guaranty agreements in favor of
27  TAB, whereby they personally guaranteed the Debtor's obligations under the Real Estate Loan.  Each also signed a
    Continuing Guaranty and Waiver with respect to the Debtor's obligations under the A/R Loan.  These guaranties are
    hereinafter collectively referred to as the "Guaranties".  Each of these guarantors is hereinafter referred to as a
28  "Guarantor" and collectively as "Guarantors", and have reaffirmed the Guaranties post-petition.

c.　　　　An equipment loan dated on or about August 1, 2019, with an original

balance of approximately $805,030.00 and an estimated balance of at least $805,030.00 as

of the Petition Date (Loan No. 500108370), secured by a first-position lien on the Debtor's

titled trucks (the "Equipment Loan"), a true and correct copy of which is attached as **Exhibit**

**"H"** hereto

d.　　　　The Real Estate Loan, the A/R Loan and the Equipment Loan (collectively,

the "Pre-Petition Loans") are cross-collateralized.　The unpaid balance of all of the Pre-

Petition Loans was at least $4,710,438.00 as of the Petition Date, exclusive of legal fees

and costs (collectively, the "Pre-Petition Obligations").

5.　　　　Subject only to the provisions hereinbelow relating to the ability of parties-in-

interest to challenge the validity, security, amount or priority of TAB's claims under the Pre-

Petition Loans, the following appears to be true:

a.　　　　As of the Petition Date, the Pre-Petition Obligations totaled at least

$4,710,438.00.

b.　　　　As security for the payment of the Debtor's indebtedness under the loan

documents evidencing the Pre-Petition Loans (hereinafter, the "Loan Documents"), the

Debtor granted to TAB, pursuant to the Loan Documents, a senior, first-in-priority security

interest in and liens (the "Pre-Petition Liens") on all or substantially all of the Debtor's

tangible and intangible personal and real property and equipment (subject to certain liens in

favor of Ciras, LLC and 19th Capital Group, LLC. as further discussed below in Section

III.C.3), wherever located, that was acquired by the Debtor prior to the Petition Date,

including without limitation the Florin Road Property, all of its accounts, accounts

receivable, inventory, equipment, fixtures, general intangibles, chattel paper, contract

rights, permits, real estate, tax refunds, insurance proceeds, documents, instruments,

investment property, deposit accounts, books and records and other collateral (hereinafter,

the "Pre-Petition Collateral").

32. The Debtor cannot continue to operate unless it can use the Pre-Petition Collateral in the

ordinary course of its business to pay its administrative priority obligations.

10

33. The Debtor is not aware of any liens or security interests on the Pre-Petition Collateral other than TAB's Pre-Petition Liens.

34. The Debtor acknowledges that it is and will be truly and justly indebted to TAB, without defense, counterclaim, or offset of any kind, and that, pursuant to the Pre-Petition Loan Documents, the Debtor will use the proceeds of any financing extended post-petition by TAB (hereinafter, the "Post-Petition Financing") in accordance with the terms of the DIP Financing Motion and to pay in full all debts owed Pre-Petition and Post-Petition to TAB.

35. The Debtor acknowledges that as security for repayment of its indebtedness to TAB pursuant to the Post-Petition Financing (hereinafter, the "Post-Petition Obligations"), the Debtor will grant to TAB senior, first-in-priority and priming security interests in, and liens on all of the Pre-Petition Collateral.

36. The Debtor acknowledges that as security for repayment of its Pre-Petition Obligations, the Debtor will grant to TAB senior, first-in-priority and priming security interests in, and liens on all of the Debtor's post-petition tangible and intangible personal and real property assets, existing as of the Petition Date or hereafter acquired (collectively, the "Post-Petition Collateral"). As adequate protection for and to the extent of any diminution in value of its interest in the Cash Collateral resulting from (a) the use of Cash Collateral pursuant to Bankruptcy Code Section 363(c); and (b) the use, sale or lease of Pre-petition Collateral other than Cash Collateral:

       a.  Effective upon entry by order from this Court and without the necessity of executing security agreements, financing statements or other such documentation, TAB is hereby granted replacement security interests and liens in and to all of the Debtor's post-petition assets including, without limitation, all of the Debtor's cash, accounts, accounts receivable, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter of credit rights, commercial tort claims, investment property, and books and records relating to any assets of the Debtor and all proceeds (including insurance proceeds) of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located (all such property being collectively referred to hereinafter as the "Replacement

1    Collateral") as adequate protection to the extent of any use, sale or lease of any Pre-

2    Petition Collateral or post-petition collateral (hereinafter collectively, the "Collateral")

3    by the Debtor.  Such liens are referred to herein as the "Adequate Protection Liens"

4    and shall not attach to avoidance actions or avoidance action proceeds (e.g., actions

5    under Bankruptcy Code Sections 544, 545, 547, 548 and 550).

6    b.   Nothing herein shall be deemed to be a waiver by TAB of its rights to request additional

7         or further protection of its interest in any property of the Debtor.  TAB shall be deemed

8         to have reserved all rights to assert entitlement to the protections and benefits of

9         Bankruptcy Code Section 507(b) in connection with any use, sale, or other disposition

10        of any of the Collateral, to the extent that the protection afforded to TAB's interests in

11        any Collateral proves to be inadequate.

12    c.   Reporting.  Debtor will provide TAB with a copy of its monthly general account

13        statements within five business days of receiving same.

14    d.   Automatic Perfection of Liens.  The Adequate Protection Liens shall be deemed valid,

15        binding, enforceable and perfected as set forth hereinabove.  TAB shall not be required

16        to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds,

17        notices of lien or any similar document or to take any other action (including possession

18        of any of the Replacement Collateral) in order to perfect any of the Adequate Protection

19        Liens.  If TAB chooses, in its discretion, to file any such mortgages, deeds of trust,

20        security deeds or UCC-1 financing statements, or take any other action to perfect any

21        part of the Adequate Protection Liens, the Debtor and its officers shall cooperate by

22        executing any documents or instruments that TAB shall reasonably request, and all

23        such documents and instruments shall be deemed to have been filed or recorded at the

24        time and on the date of entry of the Parties into this Stipulation.  TAB may, in its sole

25        discretion, file a certified copy of this Motion/Order in any filing office in each

26        jurisdiction in which the Debtor is organized or has or maintains any office or

27        Replacement Collateral, and each filing office is directed to accept such certified copy

28        of this Motion/Order for filing and recording without the imposition of any stamp,

1　　　　intangibles, recording or similar tax in accordance with the provisions of Bankruptcy

2　　　　Code Section 1146.

3

4　　　I declare under penalty of perjury of the laws of the United States that these facts are true

5　to the best of my knowledge and belief.

6　　　　　DATED this 27th day of November, 2019

7

8　　　　　　　　　　　　　　　　　　　/s/ Alban Lang
　　　　　　　　　　　　　　　　　　　Alban Lang
9　　　　　　　　　　　　　　　　　　　Vice President of Debtor

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28